## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

---

PARK 80 HOTELS LLC, a Louisiana limited
liability company, PL HOTELS, LLC, a Louisiana
limited liability company, individually, and on behalf
of a class of similarly situated individuals and
entities,

Plaintiffs,

v.

HOLIDAY HOSPITALITY FRANCHISING,
LLC, SIX CONTINENTS HOTELS, INC. d/b/a
INTERCONTINENTAL HOTELS GROUP and
IHG OWNERS ASSOCIATION, INC.,

Defendants.

---

Civil Action No. 2:21-cv-974

**CLASS ACTION COMPLAINT**

**<u>JURY TRIAL DEMANDED</u>**

---

## <u>CLASS ACTION COMPLAINT</u>

### <u>INTRODUCTION</u>

1.     Defendant Six Continents Hotels, Inc. ("SCH") is the world's largest hotel company by room count, and does business under the name InterContinental Hotels Group ("IHG") (SCH and IHG may hereinafter be collectively referred to as "IHG").

2.     IHG operates approximately some 5,600 hotels across more than 15 brands.  IHG takes an asset-light approach, owning, franchising and/or managing hotels for third parties, with Holiday Inn as its mainstay chain, under such brands as Holiday Inn, Holiday Inn Express and Holiday Inn Resorts, each bearing the identification as "an IHG Hotel."

3.     IHG also owns, manages and/or franchises other hotel brands such as Crowne Plaza, InterContinental, Staybridge Suites, Candlewood Suites, Hotel Indigo, Regent and Kimpton.

4.     IHG's Holiday Inn brands account for approximately 70% of its total hotel count.

5.     IHG owns Defendant Holiday Hospitality Franchising, LLC ("HHF"), its affiliate which offers and sells Holiday Inn brand franchises including, but not limited to, Holiday Inn,

1

Holiday Inn Express and Holiday Inn Resort.

6.     Defendant IHG owns and acts through its franchising affiliate, HHF and its agent and representative IHG Owners Association ("IHGOA").

7.     HHF enters into franchise agreements titled "Holiday Hospitality Franchising, LLC License Agreement(s)" ("License Agreement") with HHF franchisees.

8.     Plaintiff, Park 80 Hotels, LLC ("Park 80") is a franchisee that owns and operates one or more hotels that bear a HHF brand mark pursuant to a License Agreement.

9.     Plaintiff, PL Hotels, LLC ("PLH") is a franchisee that owns and operates one or more hotels that bear a HHF brand mark pursuant to a License Agreement.  (Park 80 and PLH may be referred to collectively as "Plaintiff" or "Franchisee").

10.    Plaintiff, along with the vast majority of HHF Franchisees are individuals, single member limited liability companies or closely held corporations who are either immigrants or second-generation Americans of Indian or other South Asian origin.

11.    The hotel franchise industry holds particular appeal and attraction to these HHF Franchisees by providing investment and traditional family business ownership opportunities which they can build through diligence, dedication and hard work.

12.    This class action lawsuit seeks to put an end to IHG/HHF's unlawful, abusive, fraudulent, anticompetitive and unconscionable practices designed solely to benefit and enrich IHG/HHF's shareholders and to do so at the expense and to the detriment of Plaintiff and the class members, namely, similarly situated franchisees.

13.    As detailed below, Defendants have and continue to engage in unconscionable, fraudulent, unlawful, anticompetitive and discriminatory business practices in connection with the IHG Hotel franchise system.

14.    At the heart of IHG/HHF's unlawful scheme is its requirement that its franchisees

2

use certain mandated vendors and suppliers for the purchase of goods and services necessary to run a hotel. IHG/HHF's forced exclusive use of certain chosen vendors and suppliers imposes well above-market procurement costs on franchisees which include, but are not limited to, those associated with its onerous and exorbitant Property Improvement Plan ("PIP").

15.    Under the guise of improving the franchisees' hotels to maintain "brand standards", IHG/HHF forces its franchisees to frequently undertake expensive renovations, remodeling, and construction as part of the PIP, and in so doing manipulates and shortens the warranty periods on mandated products the franchisees must purchase, then disingenuously uses this to justify PIP requirements as purportedly necessary to meet "brand standards" when, in reality, IHG/HHF's sole purpose is to maximize its kickbacks and unjustifiably run up costs on their franchisees in bad faith.

16.    IHG/HHF deceitfully represent to their franchisees that they select vendors with the laudable goal of using the franchisees' collective bargaining power to secure a group discount and to ensure adequate quality and supply of products and services, and refer to these procurement programs as the "IHG Marketplace."

17.    In fact, however, IHG/HHF's primary goal in negotiating with vendors has little to nothing to do with the best interests of franchisees but rather is to secure the largest possible kickback for itself, which vendors finance through the above-market rates charged to franchisees in collusion with IHG/HHF.

18.    Furthermore, the above-market priced products which IHG/HHF forces franchisees to purchase through the IHG Marketplace and related programs is overwhelmingly of inferior quality. These low-quality "IHG Approved" purchases are forced upon franchisees and disingenuously characterized as meeting supposed brand standards of quality, when in truth the sole purpose is to maximize kickbacks for IHG/HHF and unjustifiably run up costs on their franchisees in bad faith.

19.     Upon information and good faith belief, IHG/HHF have each netted tens of millions of ill-gotten dollars from this fraudulent kickback scheme.

20.     Additionally, IHG/HHF engages in other oppressive, bad-faith, fraudulent and unconscionable conduct as more fully described herein.  For instance, IHG holds itself out to the public as offering discounts, travel benefits and other perks to repeat guests through its IHG Rewards Club loyalty program.  IHG has a mobile booking app as well as cloud-based hotel solutions which it represents as driving demand for its hotel owners and which ostensibly allow hotel owners to reach potential guests at a lower cost.  Hotel guests can accumulate points per dollars spent which can be redeemed at IHG hotels.  When those points are then redeemed at a hotel, however, only a small fraction of the value is reimbursed to franchisees while beginning in 2018 IHG/HHF has required that Plaintiff and franchisees (and *not* IHG/HHF) also pay sales tax on the full value of the product or service obtained by hotel guests.  Furthermore, in instances where hotel guests' accumulated reward points from stays at Plaintiff's (or other franchisees') hotel expire, the points never return to Plaintiff or to any source-of-origin franchisees.

21.     IHG/HHF also routinely introduces new marketing programs under the guise of providing franchisees with a "choice" as to whether they should participate or not.  In reality, however, all such marketing programs are forced upon the franchisees insofar as any and all decisions to "opt out" are met with vindictive, punitive and retaliatory action by IHG/HHF.  These programs are in addition to all marketing fees contracted and paid for by the franchisees, and serve as an abusive way to impose additional fees and fines for the sole profit and benefit of IHG/HHF, and to do so without disclosure or agreement by deceit, implied threat and actual retribution rendering franchisees' supposed "opt-out" choice completely illusory.

22.     Furthermore, although the facts set forth herein predominantly existed before March, 2020 and continuously thereafter, IHG/HHF has ceased all of its marketing since the imposition of

4

Covid-19 related restrictions in early 2020.  Despite the fact that IHG/HHF has not been engaged in any marketing activities or efforts for approximately a year, it continues to require franchisees to pay significant marketing related fees for which they receive nothing in return.

23.    Moreover, IHG/HHF routinely assesses additional fees and penalties against franchisees which are not authorized by the applicable License Agreement and fundamentally excessive and unfair.  These fees and penalties are disingenuously assessed as a means to intimidate franchisees, including to serve as bad faith bases for default notices and threatened termination, as well as to harm the economic viability, profitability and creditworthiness of franchisees.

24.    For instance, IHG/HHF routinely requires its franchisees to pay multiple fees for the same product or service.  And, IHG/HHF routinely asseses additional fees against franchisees for services and products that IHG/HHF either does not, in fact, provide or provides at an inferior quality.

25.    IHG/HHF imposes requirements on its franchisees to undergo hotel inspections any time there are conversions, construction, changes in ownership, brand changes or re-licensing.  In conjunction with IHG/HHF's unilaterally imposed mandates for any such hotel changes, IHG/HHF requires its franchisees to pay for the inspections, IHG/HHF's written reports and any re-evaluations and re-inspections that IHG/HHF alone deems necessary. In practice, IHG/HHF stages these inspections to maximize criticism of franchisee Hotels as a pretext for imposing additional inspections, reports and fines, all deliberately interposed for IHG/HHF's own financial benefit and to the detriment of franchisees.

26.    IHG/HHF arbitrarily imposes rules and regulations and/or unreasonably interprets rules and regulations in order to justify assessing monetary penalties against franchisees.

27.    Quite egregiously, IHG/HHF routinely discriminates, demeans, and is both explicitly and implicitly hostile and bigoted towards Plaintiff, and towards Indian-American and South Asian-

American franchisees.

28.     IHG/HHF corrupts its Owners Association, the IHGOA, the function of which IHG/HHF represents in the License Agreement "to function in a manner consistent with the best interests of all persons using the System" but instead is staffed almost exclusively with IHG/HHF representatives to the exclusion of franchisees and operates to undermine and to harm the very hotel owners and franchisees it purports to represent.

29.     HHF's actions are unconscionable and outrageous, and have pushed franchisees to the financial breaking point.

30.     This class action lawsuit seeks monetary damages, injunctive and other relief for: (a) Count I - breach of contract; (b) Count II - breach of the implied covenant of good faith and fair dealing; (c) Count III - breach of fiduciary duty; (d) Count IV – declaratory judgment; (e) Count V - recovery for violations of the Sherman Act, 15 U.S.C. § 1; and, (f) Count VI – an accounting.

## JURISDICTION AND VENUE

31.     This Court has subject matter jurisdiction over the federal law claims raised in this class action lawsuit pursuant to pursuant to 28 U.S.C. § 1331 as Plaintiff alleges violations of a federal statute, the Sherman Act, 15 U.S.C. § 1.

32.     This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, Pub. L. No. 109-2 Stat. 4 ("CAFA"), which, *inter alia*, amends 28 U.S.C. § 1332, at new subsection (d), conferring federal jurisdiction over class actions where, as here: (a) there are 100 or more members in the proposed class; (b) some members of the proposed Class have a different citizenship from Defendants and (c) the claims of the proposed class members exceed the sum or value of five million dollars ($5,000,000) in aggregate.  *See* 28 U.S.C. § 1332(d)(2) & (6).

33.     This Court has subject matter jurisdiction over the state law claims raised in this

action pursuant to 28 U.S.C. § 1367, because they arise from the same set of operative facts as the federal law claims.

34.    This Court has personal jurisdiction over Defendants IHG, HHF and IHGOA because all Defendants regularly transact business within the geographic boundaries of this District by, *inter alia*, entering into franchising agreements with franchisees and engaging in routine, systematic and continuous contacts with persons in this District.

35.    Venue is proper in this judicial district pursuant to 18 U.S.C. §§ 1965(a), 1965(b), because Defendants HHF, IHG and IHGOA have agent(s) in, and regularly transact their business affairs in, this District by, *inter alia*, entering into franchising agreements with franchisees, because said Defendants regularly transact business within the geographic boundaries of this District by, *inter alia,* collecting membership fees from franchisees, and, in the alternative, because the ends of justice require said Defendants to be summoned to this District.

36.    Venue is proper in this judicial district pursuant to the Louisiana Revised Statutes, Title 12, Section 1042 which provides:

> §1042. Franchise agreements; provisions for dispute resolution
>
>    Unless provisions of a business franchise agreement provide otherwise, when the business to be conducted pursuant to the agreement and the business location of the franchisee are exclusively in this state, disputes arising under a business franchise agreement shall be resolved in a forum inside this state and interpretation of the provisions of the agreement shall be governed by the laws of this state.

LSA-R.S. 12:1042.

37.    The business conducted by Plaintiff Park 80 is pursuant to a franchise agreement with HHF, and the business to be conducted pursuant to said agreement and the business location of Park

80 are both exclusively in Louisiana.

38.     The business conducted by Plaintiff PLH is pursuant to a franchise agreement with HHF, and the business to be conducted pursuant to said agreement and the business location of PLH are both exclusively in Louisiana.

## PARTIES

39.     Plaintiff Park 80 operates a HHF franchise hotel, specifically a Holiday Inn Express Hotel located in Louisiana.

40.     Plaintiff PLH operates a HHF franchise hotel, specifically a Staybridge Suites Hotel located in Louisiana.

41.     Defendant HHF is a Delaware-registered limited liability company with its principal place of business located at Three Ravinia Drive, Suite 100, Atlanta, Georgia 30346.

42.     Defendant IHG is a Delaware-registered corporation with its principal place of business is Three Ravinia Drive, Suite 100 Atlanta, Georgia 30346.

43.     Defendant IHGOA is a Georgia non-profit corporation with its principal place of business is Three Ravinia Drive, Suite 100 Atlanta, Georgia 30346.

## COMMON FACTUAL ALLEGATIONS

### *The Parties' Relationship*

44.     IHG has been in operation since 2003.

45.     Throughout its history, IHG has created and acquired hotel brands, including, but not limited to, Holiday Inn, Holiday Inn Express and Holiday Inn Resort.

46.     IHG's franchising affiliate, HHF, licenses the right to use these hotel brand marks to franchisees, including Plaintiff, by entering into franchise agreements with them, which in many cases are referred to as "License Agreements."

47.     IHG owns HHF and has developed relationships with various vendors and suppliers

to IHG/HHF franchisees.

48.     By virtue of its ownership of HHF and control over the IHG Marketplace, IHG is an intended third-party beneficiary of the License Agreements.

49.     In connection with the License Agreements, HHF uses its superior bargaining power to coerce the franchisees into accepting onerous, unequal and unconscionable terms in its License Agreements.

50.     These onerous terms put immense financial stress on franchisees, threatening their economic viability.

51.     HHF's abuse of its position and unfair practices result in the imposition of needless and costly fees, above-market costs for necessary supplies and other goods and results in substantial impacts on HHF franchisees' ability, who manage and operate their properties commensurate with the highest standards, to operate their properties profitably.

52.     Plaintiff Park 80 is an HHF Franchisee[1] pursuant to a franchise agreement with HHF dated February 25, 2014 entitled "Holiday Hospitality Franchising, LLC Holiday Inn Express Hotel New Development License Agreement"  (the "License Agreement", a copy of which is attached hereto as **Exhibit A**)[2] for a Holiday Inn Express Hotel #17137, 2280 Business Park Road, Donaldsonville, Louisiana 70346 (the "Holiday Inn  Express Hotel").

53.     Plaintiff PLF is an HHF Franchisee pursuant to a franchise agreement with HHF dated October 30, 2014 entitled "Holiday Hospitality Franchising, LLC Staybridge Suites Hotel New

---

[1]     Pursuant to the First Addendum to License Agreement dated November 9, 2016, Kishorbhai S. Patel was replaced as the Licensee by Park 80 Hotels LLC, a Louisiana limited liability company.

[2]     This License Agreement is attached as an exemplar with all citations and references equally applicable to both Plaintiffs, Park 80 and PLH, insofar as the respective License Agreements contain identical provisions.

Development License Agreement" (*see, e.g.* **Exhibit A**)[3] for a Staybridge Suites Hotel #17547, Intersection of Interstate 220 and West Prien Lake Road, Lake Charles, Louisiana 70605 (the "Staybridge Suites Hotel") (the "Holiday Inn Express Hotel" and the "Staybridge Suites Hotel" may be referred to individually or collectively as the "Hotel")

54.     Pursuant to the subject License Agreement, Defendant HHF granted Plaintiff a non-exclusive license to use Defendant's System (as defined therein) only at the Hotel and in accordance with the License Agreement. *See* License Agreement, §§1(b), 2.

***Vendor Mandates and Kickbacks – the IHG Marketplace Programs***

55.     A particular manner by which IHG/HHF undermines the viability and profitability of its franchisees is by mandating Plaintiff and HHF franchisees utilize only HHF approved third-party vendors, the purpose of which is for Defendants to derive a significant financial benefit at the direct expense and to the financial detriment of the HHF franchisees.

56.     IHG/HHF's fraudulent and unconscionable scheme cannot operate without franchisees paying excessive, above-market rates for the goods and services necessary to run a hotel, including, but not limited to:

> (a) its computerized credit card processing system, Secure Payment Solution ("SPS") which all Hotels are required to use;
>
> (b) high speed guest internet services, designated workstations and multi-function printers in Hotel business centers ("Public Access Computers"), and a designed communication service referred to as "SCH Merlin";
>
> (c) HHF's approved Keycard System;
>
> (d) televisions and in-room entertainment compatible with SCH Studio;

---

[3]     The Park 80 License Agreement attached as an exemplar applies equally to Plaintiff PLH insofar as it contains identical provisions to the License Agreement referenced herein.

(e) an alert system that enables employees to notify hotel management of an emergency ("Employee Safety Devices");

(f) equipment, software, and services for property-level technology and telecommunications systems;

(g) equipment associated with the Defendants' gift card program;

(h) mandated food and beverage programs;

(i) furniture, furnishing, linens, food products, utensils, and goods for guests' consumption and

(j) additional advertising materials, products, services, equipment or supplies, from which IHG/HHF profits.

57.     The above-market rate pricing charged by vendors and paid by Plaintiff and the franchisees provides the money necessary for those vendors to pay IHG/HHF's unreasonable and unconscionable kickbacks.

58.     IHG/HHF knowingly and willfully engage in conduct that ensures franchisees pay above-market prices for goods and services necessary in conjunction with operation of the hotels.

59.     IHG/HHF requires that Plaintiff and HHF Franchisees strictly comply with its requirements for the types of services and products that may be used, promoted or offered at the hotel, and comply with all of HHF's "standards and specifications for goods and services used in the operation of the Hotel and other reasonable requirements to protect the System and the hotel from unreliable sources of supply." *See* License Agreement *generally*.

60.     If IHG/HHF requires HHF franchisees to purchase equipment, furnishings, supplies or other products for the hotel from a designated or approved supplier or service provider, whether pursuant to the License Agreement, Standards, or any communication from HHF, then HHF franchisees must purchase the mandated product(s) from mandated vendors and cannot under any

circumstances deviate from those vendor mandates without prior approval from HHF.

61.     Defendants IHG and HHF run a program under the guise of being voluntary and which they falsely represent as delivering value and lower cost purchasing opportunities to HHF franchisees.  Nothing could be further from the truth.  Defendants refer to these procurement programs as the "IHG Marketplace."

62.     IHG Marketplace operates on a cost recovery basis with fees for both procurement and technical ordering transaction services included in the supplier invoiced price.

63.     HHF franchisees purchase goods and services directly from suppliers at prices negotiated by HHF and/or IHG.

64.     These prices are invariably above-market prices which do not permit the HHF franchisees to seek competitive pricing for their own benefit.

65.     Rather, these inflated prices allow for rebates that go to IHG and HHF directly by suppliers which generally range from approximately 1-5% of the amount of the invoice price for the goods and services purchased by franchisees.

66.     These kickbacks to IHG and HHF are the primary—if not the sole—reason HHF franchisees are forced to use expensive vendors and suppliers not of their own choosing at *supra*-competitive pricing.

67.     Some primary examples of the IHG Marketplace sourced vendor mandates involve credit card processing and high speed internet agreements, with Defendants requiring franchisees to execute these infrastructure related agreements.

68.     Although IHG/HHF represent that franchisees have a choice between vendors, it is usually only between no more than three vendors hand-picked by Defendants from whom they obtain significant rebates.

69.     Although franchisees are able to secure far more reasonable rates for, for example,

credit card processing from alternate sources, IHG/HHF do *not* permit franchisees to do so on the open market and instead require franchisees to pay the higher rates of Defendants' selected vendors.

70.     This is similarly true in the case of hotel internet services which IHG/HHF does *not* permit franchisees to purchase on the open market and instead requires franchisees, in most instances, to pay more than double the price for lower speeds than what franchisees could purchase independently from the same or alternate sources.

71.     This mandated lack of choice invariably increases franchisees' costs and expenses, and benefits only IHG/HHF in the form of kickbacks.

72.     The costs charged to franchisees in the IHG/HHF procurement programs such as the IHG Marketplace are almost always higher than if the same product or service were purchased by an independent hotel outside of the HHF System.

73.     Defendants frequently use the pretext that the vendor requirements imposed on franchisees are necessary for standardization or—more curiously—for security.  In the case of security, however, IHG has recently been the victim of a significant data hack.  This is but one factor illuminating that Defendants' assertion of security, for example, is merely a pretext to charge franchisees higher vendor rates in order for IHG and HHF to profit from kickbacks.

74.     In fact, many products and services that HHF franchisees are required to obtain based on Defendants' vendor mandates are at an excessive cost but inferior quality.

### *Franchisee Fees & the Property Improvement Plan*

75.     As a prerequisite to becoming an HHF Franchisee, IHG/HHF charges (and Plaintiff actually paid) an initial application fee of $500 per guest room (sometimes referred to as a "key") and up to $50,000 simply for the privilege of submitting an application for an HHF franchise or license.  This application fee applies for new development, conversion, change of ownership or re-licensing.

76.     Only then does IHG/HHF determine whether it will approve the application for a license, and in the case of unapproved applications, IHG/HHF retains $15,000 which is forfeited by franchise/license applicants for absolutely no return benefit.

77.     If IHG/HHF does approve an application, IHG/HHF still has the sole discretion to revoke its approval thereafter and to retain an applicant's entire application fee and to deem it "non-refundable," again providing applicants with no benefit in return for IHG/HHF taking an amount up to $50,000 and leaving applicants without recourse.

78.     IHG/HHF also maintains what it calls its "Property Improvement Plan" (PIP).

79.     Before any HHF franchisee submits an application for conversion, change of ownership, brand change or re-licensing, franchisees must arrange for HHF to conduct an inspection of the Hotel so that IHG/HHF can prepare written specifications for the upgrading, construction and furnishing of the Hotel in accordance with its HHF's defined "Standards."

80.     Under the PIP, HHF franchisees must pay a non-refundable $6,500 fee to have their Hotel inspected and for preparation of a PIP report.  In the case of conversion hotels, IHG/HHF will not authorize reopening unless and until it has determined that all PIP requirements have been completed, including the submission of plans before the start of construction in accordance with the dates specific in the License Agreement.

81.     As part of PIP, IHG/HHF charges up to an additional $5,000 for each re-evaluation and re-inspection it may deem necessary in the event any hotel fails its opening inspection. IHG/HHF frequently uses this, and imposes further fines, as a means to enrich themselves to the detriment of the franchisees.

82.     IHG/HHF neither requires nor imposes its inspections, re-inspections, re-evaluations and/or written reports in good faith.  To the contrary, IHG/HHF uses these inspections as a pretext to generate the aforesaid fees and fines, and prepares disingenuously negative reports in

14

order to generate revenue for itself in the form of fines and required re-inspections, reports and impact studies, all intended to harm the economic viability and creditworthiness of its franchisees.

83.    Franchisee objections to this bad faith process are disregarded and dismissed, and met with derision, threats, intimidation and retaliation.

84.    The license that IGH/HHF grants to Plaintiff and HHF franchisees to "use the System only at the Hotel, but only in accordance with this License" (and during the License Term) defines the System broadly and with significant open-ended discretion for HHF.

85.    This discretion allows IGH/HHF to put a stranglehold on franchisees and broadly impose onerous costs and obligations on franchisees:

> The System is composed of all elements which are designed to identify Holiday Inn, Holiday Inn Express and Holiday Inn Resort branded hotels to the consuming public or are designed to be associated with those hotels or to contribute to such identification or association and all elements which identify or reflect the quality standards and business practices of such hotels, all as specified in this License or as designated from time to time by Licensor. The System at present includes, but is not limited to, the service marks Holiday Inn®, Holiday Inn Express®, Holiday Inn Express® & Suites, Holiday Inn® & Suites and Holiday Inn® Resort, (as appropriate to the specific hotel operation to which it pertains), Holidex® and the other Marks (as defined in paragraph 7.B below), and intellectual property rights made available to licensees of the System by reason of a license; all rights to domain names and other identifications or elements used in electronic commerce as may be designated from time to time by Licensor in accordance with Licensor's specifications to be part of the System; access to a reservation service operated in accordance with specifications established by Licensor from time to time; distribution of advertising, publicity and other marketing

15

programs and materials; architectural drawings and architectural works; the furnishing of training programs and materials; confidential or proprietary information standards, *specifications and policies for construction, furnishing, operation, appearance and service of the Hotel*, and other requirements as stated or referred to in this License and from time to time in Licensor's brand standards for System hotels (the "Standards") or in other communications to Licensee; *and programs for inspecting the Hotel*, measuring and assessing service, quality and consumer opinion and consulting with Licensee. *Licensor may add elements to the System or modify, alter or delete elements of the System in its sole judgment from time to time.*

License Agreement, §1(B) (emphasis added).

86. There is no limitation on the extent to which HHF can alter, modify or revise its "Standards" or impose costs and obligations on HHF franchisees, which it does not disclose and have never been the subject of any arms' length agreement. *See id.*, §§1(B), 4(E), 5.

87. The IHG/HHF PIPs are designed with substandard products and designs, purposefully limit vendor choices for HHF franchisees and impose above-market procurement costs.

88. For example, most furniture items that IHG/HHF mandates its franchisees purchase from required vendors is of such inferior quality that they break, disassemble, and damage upon initial delivery and/or assembly and are rendered unusable. IHG/HHF then forces additional costs upon its franchisees to replace the mandated but damaged products, and also the costs to clean the resultant broken parts strewn and littered in the franchisees' hotels.

89. Although the IHG Owners Association (IHGOA, defined below) purports to "consider and discuss, and make recommendations relating to the operation" of franchisees' hotels, and "function in a manner consistent with the best interests of all persons using the System", IHG/HHF, and the IHGOA routinely dismiss, ridicule, and disregard franchisee concerns about its

inferior mandated products and exorbitant costs. (*See* License Agreement, §6(A)-(B))

90.     IHG/HHF forces its franchisees to repeat these PIP multimillion dollar projects every 6-8 years irrespective of the actual condition of hotels purely to generate fees and vendor kickbacks for themselves to the detriment of Plaintiff and HHF franchisees.

91.     As part of PIP, IHG/HHF deliberately scale back and manipulate standard manufacturer furniture warranties as another means purely to fit their PIP cycles, cause harm to the franchisees and, ultimately, raise prices for hotel customers.

92.     As such, HHF has imposed and continues to impose onerous PIP terms on Plaintiff and HHF franchisees which, in the sole discretion of HHF, force HHF franchisees to spend approximately $10,000 – $30,000 *per guest room*, which amounts to millions of dollars in forced renovation costs being foisted upon HHF franchisees.

93.     HHF further does so under the threat of retaliation against its franchisees in the event of noncompliance as determined subjectively by HHF in its sole discretion, which can result in termination of their franchise or other punitive measures.

### *IHG/HHF's Double-Dipping on Commissions & Introduction of Supposedly Voluntary Programs under Pressure & Retaliation for Opt-Outs*

94.     HHF franchisees pay initial marketing contributions and annual marketing fees which are represented as being applied to such things as marketing. Not content with those fees, however, IHG/HHF routinely introduce "new programs" requiring franchisees to pay additional fees, all of which go directly to said Defendants.

95.     The fees set forth in the License Agreement are based on a fixed percentage of Plaintiff's and HHF franchisees' revenue. (*See* License Agreement, §3(B)).

96.     The License Agreement, however, also purports to give HHF the unfettered, unilateral and unspecified right to impose additional fees, penalties, rules and regulations, namely

"all fees due for travel agent commission programs . . . ." (*See id.* §3(B)(1)(d)).

97.     One such program for booking and commissions is known as the Global Distribution System ("GDS").  GDS is a worldwide conduit between travel bookers and suppliers, such as hotels and other accommodation providers. It communicates live product, price and availability data to travel agents and online booking engines, and allows for automated transactions.

98.     The idea of GDS is for hotels to increase their reach to attract more customers, increase revenue and ultimtately make additional profits.  A GDS passes on hotel inventory and rates to travel agents and travel sites that request it and also accepts reservations.  Today, the databases also include online travel agencies ("OTA"s) (such as Booking.com and Expedia).

99.     IHG/HHF arbitrarily exercises this purported right to impose fees including, but not limited to, travel agent commission fees, in bad faith.  IHG/HHF does so in order to capture a continually increasing share of Plaintiff's and the HHF franchisees' revenue. HHF franchisees are charged multiple additional fees such as transaction fees, booking fees, GDS fees and excess and additional commissions through marketing and other programs.

100.     One example is IHG/HHF's imposition of the BTI (Business Traveler International) program, under which IHG/HHF double-dips on its commissions by imposing an additional 2.5% commission on HHF franchisees over and above the aforesaid traditional GDS bookings and commissions.

101.     Another example is IHG/HHF's "double-dip" on commissions for the aforesaid third-party OTA bookings, from which IHG/HHF, upon information and belief, receive kickbacks in sums unknown to HHF franchisees since IHG/HHF keep their contractual arrangements confidential while charging the franchisees multiple fees for the same products or services that HHF is already contractually obligated to perform.

102.     IHG/HHF have also allowed OTAs to share and misappropriate discounted booking

codes with third party websites who impose substantial taxes, fees and costs on unsuspecting customers and, despite knowing that such misconduct is ongoing, IHG/HHF have failed to enjoin such misconduct on the part of OTAs to IHG/HHF's benefit and the substantial detriment of franchisees.

103.    IHG/HHF also sends sales leads to Plaintiff's hotel and to HHF franchisees, the origin of which is unknown to the franchisees, through its Meeting Broker program.  These leads have 3% commissions if they actualize and franchisees are billed based on revenue speculated by IHG/HHF unless franchisees reports updated actual numbers.

104.    Plaintiff and other franchisees will frequently turn away these leads due to the fact that they have previously built their own relationships prior to the duplicate lead coming from Meeting Broker.  Nonetheless, IHG/HHF uses this as a tactic to charge additional commissions and to demand that the franchisees prove the prior relationship, in essence stealing sales leads and revenues developed by Plaintiff and HHF franchisees.

105.    IHG/HHF further abuses its discretion by requiring franchisees to provide bank account information to the OTAs that IHG/HHF contracts with.  These OTAs will then automatically debit the HHF franchisee accounts on a monthly basis for all reservations sent to the hotel.  The onus thus falls on Plaintiff and HHF franchisees to reconcile and to dispute commission charges for no-shows, cancellations or invalid credit cards, without any support from IHG/HHF.

106.    The result is that funds are taken from the franchisees without recourse, the OTAs collect unearned commissions, IHG/HHF receive kickbacks and franchisees are damaged without recourse nor any franchisor support.

107.    IHG/HHF further abuses its position by introducing marketing programs and other programs solely to its General Manager and Director of Sales, bypassing the HHF franchisees entirely.  These programs are represented as voluntary and consensual programs which Plaintiff and

HHF franchisees can, in theory, choose whether to participate or not.

108.   However, neither Plaintiff nor franchisees have any direct access to the program information and can only gain access through IHG/HHF's general manager or sales director, depriving them of any real choice or opt-out alternative.

109.   Additionally, such programs purportedly offered by IHG/HHF to franchisees as optional truly are not since IHG/HHF accompanies the presented "option" with threats of retaliation including, but not limited to, being told that franchisees' hotels will be suppressed or removed from search engine results.

110.   Faced with threats of retaliatory action from Defendants that further undermine the HHF franchisees profitability and/or economic viability, the representation that Plaintiff or HHF franchisees have any true choice is truly illusory.

111.   In short and in sum, IHG/HHF introduces new or "additional" programs solely as a basis to create additional revenue streams and profit to the detriment and cost of the HHF franchisees.

### *IHG Rewards Program; Points Plus Cash*

112.   Defendants introduced, maintain and run an IHG Rewards Club Program by which Hotel guests can earn points by staying at hotels within IHG's network, as well as by purchasing goods and services with IHG partner vendors, including Groupon, Grubhub and OpenTable, provided these services are purchased through an SCH channel.

113.   Points can also be earned for activities booked on the SCH Trip Extras page. For IHG Rewards Club Premier Credit Card holders or IHG Rewards Club Traveler Credit Card holders, additional points can be earned at IHG/HHF properties worldwide and on purchases made.

114.   Defendants' actual management of this program, however, is yet another bad faith means by which IHG and HHF profit off the backs of and to the detriment of their franchisees.

115.   Participating members earn 10 reward points for every $1 spent.  When those points

are earned from staying in the hotel of Plaintiff or other HHF franchisees, that hotel serves as the point of origination for the points. In effect, when a customer redeems points to earn free hotel night(s), the Plaintiff or other HHF Franchisee Hotel does not receive payment.

116.    If a franchisee hotel is at 96% occupancy, IHG/HHF reimburses the participating franchisee hotel for the full room rate.

117.    However, if a franchisee hotel is at less than 96% occupancy, IHG/HHF only reimburses the participating Franchisee hotels $30 for the value of products or services that redeemed points were applied to, retaining the remainder for themselves and leaving IHG/HHF franchisees to earn only a small fraction of such things as nightly room rates to their economic detriment.

118.    IHG/HHF also has a Points Plus Cash Program which it has never disclosed in its FDD or License Agreement. If participating members do not have enough points to fully redeem a full night's stay at a hotel or they do not desire to pay local sales tax, they have the option to combine rewards points with cash. In this instance, the nightly hotel rate is lowered and all cash paid by the customer is retained by IHG/HHF and none goes to the HHF franchisee hotel. This violates the License Agreement which provides that direct revenue from hotel guests goes to the HHF franchisee while IHG/HHF should only be entitled to collect fees from franchisees as provided therein. *See* License Agreement.

119.    There is no transparency by IHG/HHF regarding the IHG Rewards Club Hotel Rewards Program, as franchisees have no access to financial information and data regarding all awards, redemptions or amounts reimbursed to any Franchisee, or collected, retained, or funneled by or to IHG and/or HHF in conjunction with the IHG Rewards Club Hotel Rewards Program.

*__HHF's Fraudulent & Inconsistent Representations Regarding the Nature of its Relationship with Approved Suppliers__*

120.    Under the License Agreement, HHF requires that franchisees purchase some or all of the products and services necessary ("Mandatory Products and Services") to operate a hotel from vendors and suppliers of its own choosing (the "Approved Suppliers").

121.    HHF represents to franchisees that it will limit the number of Approved Suppliers for given products and services for the purposes of obtaining a group or volume discount and ensuring uniform quality and supply of those Mandatory Products and Services.

122.    However, upon information and belief, limiting the number of Approved Suppliers has very little to do with obtaining greater discounts or improving brand quality.

123.    Rather, upon information and belief, HHF limits the number of Approved Suppliers as part of a scheme to reduce competition within the HHF Franchise System, which in turn, allows HHF to extract larger kickbacks from vendors.

124.    HHF does not disclose to franchisees when it receives a kickback (or "rebate"), or the amount of any such "rebate."

125.    The intended purpose and effect of HHF's kickback scheme is that Approved Suppliers charge above-market rates for their goods and services.

126.    HHF does not help franchisees save time and money on their purchasing needs.

127.    Upon information and belief, HHF does not obtain group or volume discounts on behalf of its franchisees.

128.    Moreover, HHF does not ensure adequate brand quality and supply; rather, HHF at times forces franchisees to purchase, often at inflated prices, inferior Mandatory Products and Services.

129.    HHF is not attempting to promote brand quality, but is constantly auctioning off the

right to sell Mandatory Products and Services to franchisees to the highest bidding vendors.

130.    HHF is leveraging its Franchise System to secure massive "rebates" from vendors.

131.    Upon information and belief, to be approved as an Approved Supplier and to gain access to HHF's franchisees, HHF requires a *quid pro quo* in the form of kickbacks.

132.    The kickbacks include *both* fixed fees paid by Approved Suppliers to HHF, and transactional fees based on a percentage of Approved Suppliers' total sales to franchisees and their guests.

133.    The transactional fees are inextricably tied to the cost of the goods and services, meaning that as HHF's revenue from transactional fees increases as the cost of goods and services increases.

134.    HHF therefore has an inherent conflict of interest that it never discloses to franchisees.

135.    Upon information and belief, HHF's conflict of interest has led to abuse.

136.    Upon information and belief, HHF has placed its interests and financial gain, as well as the interests of Approved Suppliers over those of its franchisees.

137.    Upon information and belief, HHF has conspired with manufacturers and distributors to increase cost of goods and services that are sold to its franchisees.

138.    Upon information and belief, HHF colludes with manufacturers and/or distributors to increase the wholesale price of products, which in turn, increases the retail prices Approved Suppliers must sell to franchisees.

139.    Upon information and belief, HHF effectively fixes the retail pricing of goods and services sold to franchisees.

140.     Upon information and belief, HHF knows that Approved Suppliers cannot sell goods and services to its franchisees at competitive prices.

141.     Upon information and belief, HHF knows that Approved Suppliers must increase the cost of goods and services to account for the increased wholesale costs and well as the fixed and transactional fees that must be paid to HHF.

142.     Upon information and belief, HHF knows that Approved Suppliers will pass these costs onto franchisees.

143.     Upon information and belief, franchisees ultimately are the ones harmed by HHF's price fixing and kickback scheme.

144.     While HHF purports to give franchisees the right to, at HHF's discretion, purchase Mandatory Products and Services from vendors other than the Approved Suppliers, in practice HHF rarely, if ever, grants franchisees permission to do so.

145.     Essentially, HHF offers it franchisees no meaningful choice in vendors.

146.     HHF misrepresents to franchisees and/or conceals the nature of its relationship with Approved Suppliers, in order to lock them into the onerous License Agreements and to create excessive switching costs.

### *HHF's Imposition of Marketing Fees While Engaging in No Marketing*

147.     The License Agreement requires franchisees to pay HHF various fees, for which HHF promises to provide certain services in return.  Among these required fees are marketing fees.  (*See* License Agreement, §3(B)(1)(b), (d))

148.     The License Agreement provides that HHF franchisees shall make monthly fee payments to HHF for:

(b)      a "Services Contribution" equal to the percentage of Gross Rooms Revenue set forth in paragraph 15 below, to be used by Licensor for marketing, reservations, and other related activities which, in Licesnor's sole business judgment as to the long-term interests of the System, support marketing, reservations and other related functions.

…

Licensor may, in its sole judgment, upon 30 days' prior notice, increase this Contribution by an amount not to exceed 1% of Gross Rooms Revenue and such increase shall be effective for a period no longer than 12 months …

(d)      all fees … due in connection with mandatory marketing … and other systems and programs established by the Licensor, its parents, subsidiaries or its affiliated entities relating to the System.

*Id.*, §3(B)(1)(b), (d).

149.    The percentage of Gross Rooms Revenue that Plaintiff pays to HHF as the Services Contribution referenced in Section 3 of the License Agreement is 3%. (*See id.*, §15(a)(2)).

150.    Following the imposition of Covid-19 restrictions in or about March 2020, HHF ceased all marketing efforts and activities which the franchisees' "Services Contribution" is contractually represented as being paid to support, and said HHF marketing is the explicit benefit of the bargain which franchisees are entitled to receive in exchange for their payment to HHF.

151.    HHF has continuously required, demanded payment of and collected marketing fees from its franchisees despite providing no marketing services or programs for nearly a year.

### *IHG Owners Association: IHG/HHF Collusion with the IHGOA & its Illusory Provision of Franchisee Participation*

152.    The License Agreement provides for franchisee membership in the IHGOA, and states in relevant part that:

> The purposes of the IHG Owners Association will be to consider and discuss, and make recommendations on common problems relating to the operation of System Hotels.  Licensor will seek the advice and counsel of the IHG Owners Association's Board of Directors or, subject to the approval of Licensor, such committees, directors or officers of the IHG Owners Association to which or to whom the IHG Owners Association Board of Directors may delegate such responsibilities.

(License Agreement, §6(A)).

153.    The License Agreement provides further that HHF "recogniz[es] that the IHG Owners Association must function in a manner consistent with the best interests of all persons using the System . . . ."  (*Id*., §6(B)).

154.    HHF represents to Plaintiff and HHF franchisees that it makes a good faith effort to protect the best interests of HHF franchisees.

155.    Despite these representations, however, the IHGOA board members are essentially handpicked by IHG/HHF, and receive incentives in exchange for their loyalty to IHG/HHF's agenda and interests.

156.    Overwhelmingly, the IHGOA board members and members are not franchisee hotel owners, but rather employees of the management companies that operate IHG/HHF properties.  They have no stake in, and do not share the interests, objectives, or concerns of the HHF franchisees they purport to represent.

157.    While IHGOA's board members are nominally elected by all franchise owners, it is essentially impossible for dissenting voices to gain seats on the board.

158.    IHG/HHF controls the nominating process through the imposition of onerous and vague requirements for candidacy, which ensures that IHG/HHF can carefully select candidates and thus the elections to the IHGOA are noncompetitive.

159.     The collusion between the IHGOA and IHG/HHF is a fraudulent attempt to create the appearance of legitimacy to IHG/HHF's exploitative practices.

160.     IHG/HHF scoffs at the stated purposes and functions of the Owners Association as set forth in the License Agreement, affording Plaintiff and its franchisees only the illusory role of having a voice in the System, or discussing any operational recommendations for common problems at the hotels, with IHG/HHF instead acting in complete disregard for "the best intertests of *all persons* using the System."

161.     In short, IHG/HHF pursues only its own self interest to the deliberate detriment of its franchisees.

162.     The "committees, directors or officers of the IHG Owners Association" rarely include franchisees, but instead are populated by IHG and/or HHF employees to collude with said Defendants, utterly disregard genuine franchisee complaints, and to instead implement, avoid accountability for, and rubber stamp all matters decided unilaterally by and for these Defendants for the sole purpose of enriching themselves and requiring payments from franchisees.

### *IHG's Racial Discrimination Against Indian-American & South Asian-American Franchisees*

163.     In its relations with its franchises, IHG/HHF is hostile to and routinely discriminates in favor of white, black and Latino franchisees and against Indian-American and South Asian-American franchisees, by offering preferential treatment to the former, and engaging in derogatory and demeaning rhetoric and behavior and more strictly enforcing rules and regulations against the latter.

164.     IHG/HHF applies PIP enforcement, inspections and fines unequally, with unduly harsh and unequal application against its franchisees of Indian-American and South Asian-American descent.

165.     IHG/HHF applies its discretionary brand "standards" unequally, with unduly harsh

27

and unequal application against its franchisees of Indian-American and South Asian-American descent.

166.    IHG/HHF applies its discretionary brand "standards" unequally, with online manipulation of guest scores, reviews and ratings against its franchisees of Indian-American and South Asian-American descent.

167.    IHG/HHF terminates franchises more frequently and arbitrarily against its franchisees of Indian-American and South Asian-American descent, and similarly denies the granting and transfer of franchises to Indian-Americans and South Asian-Americans.

168.    IHG/HHF executives routinely make racially derogatory comments to and about Plaintiff and their Indian-American and South Asian-American franchisees.

## **CLASS ACTION ALLEGATIONS**

169.    Pursuant to Federal Rules of Civil Procedure 23(a) and (b), Plaintiff bring this action on behalf of itself and the Class ("Class") of similarly situated persons defined as:

> All United States residents (including persons and business entities) that operate or have operated a Holiday Hospitality Franchising LLC hotel in the State of Louisiana pursuant to a License Agreement from January 1, 2014 through the date of Class Certification. Excluded from the Class are the officers, directors and employees of Defendants and their respective legal representatives, heirs, successors and assigns.

### *Rule 23(a) Requirements*

170.    **Numerosity**:  Members of the Class are so numerous that their individual joinder is impractical.  The precise identities, number and addresses of members of the Class are presently unknown to Plaintiffs, but may and should be known with proper and full discovery of Defendants, third-parties and all relevant records and documents.

171.     Upon information and belief, the Class has more than 40 members.

172.     All members of the Class assert claims for violation of the law as set forth herein.

173.     **Existence of Common Questions of Fact and Law**:   There is a well-defined commonality and community of interest in the questions of fact and law affecting the members of the Class.  Among other things, the common questions of fact and law include:

(a)     Whether and to what extent Defendants' practices, conduct and misrepresentations violate the covenant of good faith and fair dealing;

(b)     Whether and to what extent Defendants' practices, conduct and misrepresentations violate federal or state law;

(c)     Whether HHF breached terms of the License Agreements;

(d)     Whether and to what extent Defendants maintained a closed market vendor marketplace in order to derive illicit profits;

(e)     Whether the Class sustained injury as a result of HHF's breaches of the License Agreement;

(f)     Whether any of the provisions of the subject HHF License Agreements are void and/or unenforceable;

(g)     Whether Plaintiff and Class members are entitled to recover compensatory, consequential, exemplary, treble, statutory or punitive damages based on Defendants' fraudulent, illegal, anticompetitive conduct or practices and/or otherwise;

(h)     Whether temporary and permanent injunctive relief is appropriate for all class members and

(i)     Whether Plaintiff and Class members are entitled to an award of reasonable attorneys' fees, prejudgment interest, and costs of suit.

174.     **Typicality**:  Plaintiff is a members of the Class.  Plaintiff's claims have a common origin and share common bases with the Class members.  They originate from the same illegal,

29

fraudulent and confiscatory practices of Defendants, and Defendants have acted in the same way toward Plaintiff and all other Class members.  If brought and prosecuted individually, the claims of each Class member would necessarily require proof of the same material and substantive facts, rely upon the same remedial theories and seek the same relief.

175.   **Adequacy**:  Plaintiff is an adequate representative of the Class because its interests do not conflict with the interests of the members of the Class they seek to represent.  Plaintiff has retained competent counsel, and intends to prosecute this action vigorously.  Plaintiff's counsel will fairly and adequately protect the interests of the members of the Class.

### *Rule 23(b)(2) & (3) Requirements*

176.   This lawsuit may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2) because Plaintiff and the Class seek declaratory and injunctive relief, and all of the above requirements of numerosity, common questions of fact and law, typicality and adequacy are satisfied.  Moreover, Defendants have acted on grounds generally applicable to Plaintiffs and the Class as a whole, thereby making declaratory and/or injunctive relief proper and suitable remedies.

177.   This lawsuit may also be maintained as a class action under Federal Rule of Civil Procedure 23(b)(3) because questions of fact and law common to the Class predominate over the questions affecting only individual members of the Class, and a class action is superior to other available means for the fair and efficient adjudication of this dispute.  The damages suffered by each individual class member may be disproportionate to the burden and expense of individual prosecution of complex and extensive litigation to proscribe Defendants' conduct and practices.

178.   Additionally, effective redress for each and every class member against Defendants may be limited or even impossible where serial, duplicate or concurrent litigation occurs arising from these disputes.  Even if individual class members could afford or justify the prosecution of their

separate claims, such an approach would compound judicial inefficiencies, and could lead to incongruous and conflicting judgments against Defendants.

## COUNT I

### Breach of Contract
### (Against HHF, SCH & IHG)

179.    Plaintiff incorporates by reference all of the foregoing allegations as if set forth at length herein.

180.    At all times relevant to this litigation, Defendant HHF possessed individual contractual relationships with each Franchisee through the License Agreements.

181.    By virtue of their ownership of HHF and control over the IHG Marketplace, IHG and SCH are intended third-party beneficiaries of the License Agreements.

182.    HHF breached its obligations under the License Agreement by, *inter alia*:

(a)    Without any limitation or stated parameters, to generally and arbitrarily alter, modify, or revise its "Standards" or "System", in its sole judgment, as a bad faith means to impose undisclosed costs and obligations on franchisees without any Franchisee input, agreement, or recourse;

(b)    Using its PIP program as a means to apply unfettered and open-ended discretion extract otherwise undisclosed fees and fees not contracted for from franchisees, by mandating exorbitant construction and renovation mandates and costs upon franchisees;

(c)    As part of the PIP program, forcing franchisees to pay non-refundable fees for mandatory Hotel inspections and preparation of PIP report(s), without any Franchisee consent or agreement, and charging additional undisclosed fees for re-inspections and re-evaluations solely as HHF deems necessary and mandates, and to arbitrarily require such re-inspections and also impose fines solely as a means of

enriching HHF;

(d)     Forcing franchisees to utilize only HHF's Approved Suppliers for the goods and services necessary to run the Hotel(s) because such vendors and suppliers provide HHF with rebates and kickbacks;

(e)     Falsely representing that the Approved Suppliers in HHF's procurement programs, including but not limited to the "IHG Marketplace" allow for Franchisee choice, and deliver value and lower cost purchasing opportunities to franchisees when, in fact, franchisees are involuntarily forced to use these Approved Suppliers, charging franchisees above-market rates, rates which are higher than the same Approved Suppliers charge hotel operators not within the HHF System, and often the Mandatory Products and Services forced upon franchisees are of inferior quality;

(f)     HHF represents to franchisees that its limited number of Approved Suppliers is for the purpose of obtaining group or volume discounts, or to ensure uniform quality and supply, when it is instead engaged in a scheme to reduce competition within the HHF Franchise System and extract larger kickbacks from these vendors.  HHF does not obtain group or volume discounts on behalf of its franchisees;

(g)     HHF leverages its Franchise System as a means to secure massive fees from vendors, granting approval to Approved Suppliers who gain access to HHF's franchisees as a quid pro quo for kickbacks in the form of both fixed fees and percentage-based transactional fees, enriching HHF from increased costs borne by franchisees for the Mandatory Products and Services.   HHF never discloses to its franchisees this inherent and abusive conflict of interest from its collusion with manufacturers and/or distributors to increase its own revenue on the backs of its franchisees;

(h)     Despite the fact that franchisees pay initial and annual fees associated with marketing, HHF introduces additional undisclosed marketing (and other) programs and fees as a means to generate additional revenue for itself to the detriment of franchisees, and without any prior disclosure to or agreement of HHF franchisees;

(i)     HHF ceased and suspended all of its marketing efforts and activities during the time of the Covid pandemic, yet continues to charge fracnhisees for the services HHF is not providing;

(j)     Use the threat and imposition of retaliation and retribution against franchisees who in any way dispute or raise questions about HHF's introduction of programs, fees, or expenses forced on franchisees without any prior disclosure or agreement, or against franchisees who, when presented with HHF programs falsely represented as optional, opt out of same;

(k)     Using its customer rewards program as a means to allow customers to redeem points earned at point-of-origin franchisee hotels for free hotel stays, depriving the franchisees of this direct revenue, but then reimbursing franchisees only a small percentage of the redeemed points (usually less than 30%) and retaining the remainder for itself and

(l)     Maintaining an IHG Owners Association, represented as a means for franchisees to consider and discuss, and make recommendations on common problems relating to the operation of System Hotels which HHF will seek the advice of and to promote the best interests of all persons using the System but, in reality, this representation is false and illusory.    Franchisees are afforded no voice, their recommendations are summarily disregarded, and the

Owners Association if populated almost entirely by IHG employees to serve the purpose of enriching IHG, HHF, and SCH, avoiding accountability, and imposing additional financial hardship on franchisees.

183.    Due to HHF's, IHG's and SCH's ongoing breach of the License Agreements, franchisees have suffered monetary damages.


## COUNT II

### Breach of the Implied Covenant of Good Faith and Fair Dealing
### (Against HHF, SCH & IHG)

184.    Plaintiff incorporates by reference all of the foregoing allegations as if set forth at length herein.

185.    At all times relevant to this litigation, Defendant HHF possessed individual contractual relationships with each Franchisee through the License Agreements.

186.    By virtue of their ownership of HHF and control over the IHG Marketplace, IHG and SCH are intended third-party beneficiaries of the License Agreements

187.    Beyond the written terms of the License Agreement, HHF, IHG and SCH owe a duty of good faith and fair dealing to franchisees in relation to its performance under the License Agreement and any related agreements.

188.    In its performance of the License Agreements, in addition to the misconduct set forth hereinabove, HHF, IHG and SCH routinely violate the duty of good faith and fair dealing with franchisees, by, *inter alia*:

(a)    Instead of using the collective bargaining power of its franchisees to negotiate discounted rates on products necessary to the operation of the hotels from Approved Suppliers, allowing – and effectively requiring – the Approved Suppliers to charge rates for Mandatory Products

and Services well in excess of the market rate, by requiring the Approved Suppliers to pay large kickbacks ("rebates") to HHF in order to earn the privilege of doing business with franchisees;

(b)     In negotiations with Approved Suppliers, prioritizing the size of the kickback an Approved Supplier is willing to pay HHF over the securing of a group discount or ensuring high quality of Mandatory Products and Services;

(c)     Forcing franchisees to use a specific credit card processor, which charges higher fees and other chargebacks causing franchisees to lose significant monies;

(d)     Forcing franchisees to purchase other Mandatory Products and Services from Approved Suppliers, when the Mandatory Products and Services provided by certain Approved Suppliers are of low quality and priced above a fair market rate;

(e)     Unfairly and wrongfully penalizing franchisees who "opt out" of allegedly voluntary programs;

(f)     Refusing to negotiate in good faith with franchisees in the wake of the Covid-19 pandemic;

(g)     Otherwise imposing onerous and unnecessary fees, penalties, and upon franchisees and

(h)     Otherwise acting to profit at the expense of franchisees' financial health.

189.     Due to HHF's and SCH's ongoing breach of the implied covenant of good faith and fair dealing, Plaintiff and other franchisees have suffered damages in an amount to be determined at trial.

## COUNT III
### Breach of Fiduciary Duty
### (Against IHGOA)

190.     Plaintiff incorporates by reference all the foregoing allegations as if set forth at length

herein.

191.    Although franchisees are not required to be members of the IHGOA, and may voluntarily opt-in or opt-out, franchisees who opt-in become IHGOA members and are required to pay membership dues annually  Irrespective of franchisee opt-ins (or opt-outs), however, the IHGOA holds itself out as, is required to, and purports to act and negotiate on behalf of all franchisees as the ostensible "voice of the owners".

192.    IHGOA assumed a fiduciary duty to represent the interests of its member Franchisees in negotiations with HHF, because:

> a.  IHGOA represents in its mission statement to the Franchisees that its purposes is to "advocate responsibly for the greater good of the membership",
>
> b.  IHGOA represents that it "instill[s] trust with open and honest communications",
>
> c.  IHGPA promotes that its "core values guide our everyday actions as we seek to fulfill our mission of helping members maximize their investment in IHG hotel brands",
>
> d.  In cooperation with HHF, the IHGOA acceptsannual fees from Franchisees who opt-in, and does so with the implied and/or explicit representation that these fees are in exchange for IHGOA's faithful representation of the interests of all Franchisees, including those who do not opt-in as IHGOA members.

193.    IHGOA routinely violates its duty of loyalty to Franchisees, in that its board members accept preferential treatment and other benefits from HHF in exchange for their compliance with and approval of onerous measures proposed by HHF, including but not limited to the imposition of new or increased fees on Franchisees, the imposition of new requirements and penalties through modification of the System, and the entry into new agreements with Approved Suppliers for

Mandatory Products and Services that inure to the benefit of HHF while imposing onerous costs on Franchisees.

194.    Upon information and belief, the kickbacks received by IHGOA board members include, but are not limited to, algorithmic preferences in HHF's reservation system, such that their franchised properties appear higher in guests' hotel search results than the properties of other franchisees.

195.    The IHGOA board is utterly unresponsive to Franchisee's concerns with relation to franchising.

196.    Franchisees have suffered damages due to IHGOA's failure to loyally represent them in an amount to be determined at trial.

197.    IHGOA's actions and omissions were willful, outrageous, oppressive, and wanton.

### COUNT IV

**Declaratory Judgment**
**(Against HHF)**

198.    Plaintiff incorporates by reference all the foregoing allegations as if set forth at length herein.

199.    As a condition of receiving the benefits of operating a HHF franchise, HHF uses its vastly superior bargaining power to require all franchisees to accept the grossly unequal terms of the Agreements, which, as to many key provisions, is essentially a "take it or leave it" contract of adhesion.

200.    The following provisions of the License Agreement (hereafter "the Unconscionable Provisions") together and/or individually are substantively unconscionable:

> (a)    HHF's open-ended right to impose mandates, fees and costs
>         on franchisees by adding, modifying, altering or deleting
>         elements of its System or its Standards in its sole judgment

and discretion, which extends to (but is not limited to): marketing programs and materials; specifications and policies for construction; programs for inspecting the Hotel; and vague, arbitrary and amorphous "other requirements as stated or referred to in this License and from time to time in Licensor's brand standards for System Hotels" (defined as the "Standards").  (Agreement, §1);

(b)     HHF's open-ended imposition upon Plaintiff as one of its responsibilities to "strictly comply in all respects with the Standards (as they may from time to time be modified or revised by [HHF]" which does no less than attempt to allow HHF to impose upon Plaintiff and demand compliance with whatever it deems beyond any explicit contractual agreement.  (Agreement, §3(A)(5));

(c)     HHF's mandate that Plaintiff strictly comply with its "standards and specifications for goods and services used in the operation of the Hotel and other reasonable requirements to protect the System and the Hotel from unreliable sources of supply", and with all HHF's requirements for services and products used in Hotels, which serves as a pretext for HHF's collusion and kickback scheme with vendors and suppliers. (Agreement, §3(A)(7));

(d)     HHF's unlimited ability to maintain and alter its "Standards" imposed upon and required of franchisees with "wide latitude", and to modify or revise same at any time in its sole discretion and without Franchisee knowledge or agreement. (Agreement, §4(D)-(E));

(e)     HHF's illusory provision of a means by which franchisees can approve its changes in the Standards only through HHF's Franchise Committee, and by purporting to afford Plaintiff a means to appeal such changes while at the same time severely restricting Plaintiff's appeal rights which

cannot be "arbitrary, capricious or unreasonable" or not "for the purpose for which intended" vis-à-vis not only HHF changes in standards but also as to any other rights explicitly afforded by the agreement.  (Agreement, §5(A)-(D));

(f)     HHF's right to termination of the agreement for any violation thereof, when HHF has given itself the right to extra-contractually alter, modify, or revise Plaintiff's obligations at any time and for any reason it may deem. (Agreement, §§1(B), 12(B)-(C));

(g)     HHF's right to termination if Plaintiff "refuses to cooperate with" inspections or audits when, in fact, HHF charges Plaintiff for all inspections and can impose them for any reason at any time as a means to impose costs and fines on Plaintiff and merely as a tool to enrich itself.  (Agreement §12(C)(13));

(h)     A provision providing for liquidated damages against franchisees in the event of Franchisee's early termination of the Agreement, or HHF's termination of the Agreement due to Franchisee's alleged breach, but not providing for liquidated damages against HHF under any circumstances (Agreement §12(E));

(i)     Provisions prohibiting Franchisee's rights to pursue claims and damages against HHF for HHF's breaches of the parties' agreement (Agreement §§14(B)(3), 14(E), 14(H));

(j)     A requirement that franchisees broadly reimburse HHF, its affiliates, subsidiaries, officers, directors, agents, partners, and employees, for any litigation regardless of which party initiates same.  (Agreement §§14(J)); and,

(k)     A provision requiring affirmative advisement of any trier of fact that HHF has rights to make changes to the parties' agreement "in the exercise of business judgment" and in every such instance those rights which are not explicitly

contracted for are "adopted in good faith and is consistent with the long-term overall interests of the System", and further prohibits any and all judges, mediators, and/or triers of fact from applying their own judgment as opposed to HHF's.  (Agreement, §14(N)).

201.    The License Agreements are procedurally unconscionable because, at the inception of the Agreements, HHF used its vastly superior bargaining position to require franchisees to accept the grossly unequal Unconscionable Terms outlined above.

202.    Specifically, as to the Unconscionable Terms, the License Agreements are contracts of adhesion offered on a "take it or leave it" basis.

203.    The Unconscionable Terms are not subject to negotiation.

204.    HHF drafts the Agreements in their entirety.

205.    An actual, present, and justiciable controversy exists between Plaintiff and HHF regarding the enforceability of the Unconscionable Provisions.

206.    Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. § 2201, Plaintiff seeks declaratory judgment from this Court that the Unconscionable Provisions listed above are unconscionable, illusory and/or unenforceable.

## COUNT V

### Violation of the Sherman Act, 15 U.S.C. § 1
### (Against HHF)

207.    Plaintiff incorporates by reference all of the foregoing allegations as if set forth at length herein.

208.    There exists markets for ownership interests in hospitality franchises, in which HHF maintains substantial market power.

209.    A separate market exists for the related goods and services associated with the operations of hospitality franchises, including but not limited to services, software, physical

furnishings, financial services, and food products (the "Mandatory Products and Services").

210.   HHF requires that franchisees purchase some or all of the Mandatory Products and Services from vendors of its own choosing (the "Approved Suppliers").

211.   In order to obtain HHF's approval to sell Mandatory Products and Services to franchisees, HHF requires Approved Suppliers to pay substantial kickbacks to HHF, which it refers to euphemistically as "rebates."

212.   Although HHF represents to franchisees that, in limiting the number of Approved Suppliers from which franchisees may purchase Mandatory Products and Services, it seeks only to obtain group discounts for Franchises and/or ensure consistent quality and adequate supplies for the franchise brand, in reality HHF chooses Approved Suppliers exclusively or primarily based upon how large a kickback those Approved Suppliers are willing to pay HHF.

213.   In actuality, the Mandatory Products and Services purchased from Approved Suppliers are often of inferior quality, and sold at above-market prices, relative to similar products sold by other vendors.

214.   While HHF does purport to give franchisees the right to, at HHF's discretion, purchase Mandatory Products and Services from vendors other than the Approved Suppliers, in practice HHF rarely, if ever, grants franchisees permission to do so.

215.   At the time they entered into the Agreements, HHF concealed the nature of its relationship with Approved Supplier from franchisees, in order to lock them into the onerous Agreements and create excessive switching costs.

216.   HHF also creates excessive switching costs through imposing onerous termination terms on franchisees, such that upon termination or expiration of the Agreement, they may be liable to pay (1) liquidated damages and (2) all outstanding fees and penalties in full, which, by virtue of HHF's right under the Agreements to unilaterally impose additional fees and penalties, may be

sufficient to prevent franchisees from exercising their termination rights, locking them into the franchise system.

217. At all times relevant HHF had monopoly power, market power, and/or economic power in the relevant Hospitality Franchise market, sufficient to force franchisees to purchase and accept Mandatory Products and Services from Approved Suppliers.

218. By reason of the terms of the Agreements and the investments franchisees have made in their franchises, coupled with the difficulties franchisees face in leaving the franchise system, HHF has substantial power in the market for both Hospitality Franchises and the market for Mandatory Products and Services.

219. HHF manipulated its economic power in the Hospitality Franchise market to coerce franchisees to purchase Mandatory Products and Services solely from Approved Suppliers, through contractual provisions contained in the Agreements, as well as exploitation of pre-contractual information deficiencies and post-contractual switching costs. Through these and other means, HHF can and does coerce franchisees to purchase nearly of the Mandatory Products and Services from Approved Suppliers.

220. Through the exercise of HHF's economic power as alleged herein, HHF has conditioned the purchase by franchisees of their franchises and their continued existence as franchises upon the purchase of Mandatory Products and Services from Approved Suppliers.

221. As a direct and proximate result of HHF's anti-competitive tying activity, franchisees have been injured by being forced to pay above-market rates for inferior Mandatory Products and Services.

222. A substantial amount of interstate commerce in Mandatory Products and Services has been adversely affected by HHF's actions. These actions impose an unreasonably negative effect on competition in the marketplace, because HHF's policy of coercing and condition the purchase and

operation of a franchise and on purchase by franchisees of Mandatory Products and Services from Approved Suppliers forecloses the ability of vendors unwilling to pay kickbacks to HHF from selling their Mandatory Products and Services to franchisees, even though the quality of such Mandatory Products and Services is equal to if not better than the quality of what is supplied by Approved Suppliers.

223.    HHF's tie of purchases of its franchises to purchase of Mandatory Products and Services from Approved Suppliers imposes an unreasonable restraint upon commerce and is therefore per se unlawful in violation of Section One of the Sherman Act, 15 U.S.C. § 1, and has caused damage to franchisees.

224.    Alternatively, if HHF's tying conduct is not *per se* unlawful, it is unlawful under the rule of reason, in that the anti-competitive consequences of HHF's conduct outweigh any pro-competitive effects thereof. Not only does HHF's conduct impose supra-competitive prices on franchisees, it impedes the ability of other vendors to engage in competition with Approved Suppliers to provide high quality Mandatory Products and Services at lower costs. Moreover, consumers are injured in that they are forced to indirectly pay the kickbacks and excessive prices for products charged to franchises by Approved Suppliers. There is no pro-business or efficiency justification for the kickbacks and supra-competitive pricing, nor does any legitimate business purpose require these practices.

## COUNT VI

### Accounting
### (Against HHF & IHGOA)

225.    Plaintiff incorporates by reference the foregoing allegations as if set forth at length herein.

226.    HHF owed franchisees express contractual duties not to charge fees which were not

contractually proscribed but nevertheless charges direct and indirect fees to Plaintiff which were not authorized by the Agreements.

227.   Defendant IHGOA owed Franchisees express and common law fiduciary duties of care, obedience, information and loyalty as a result of its special position of trust and confidence, including as agent of Franchisees, to act in the best interests of Franchisees.

228.   HHFs owes a duty to account for monies, including, but not limited to:

(a)   An accounting of the rebates it has taken from Approved Suppliers;

(b)   An accounting of all charges associated with the PIP program and all fees charged for Hotel inspections, re-inspections, evaluations, preparation of PIP reports, and any and all fines;

(c)   An accounting of all awards, redemptions, amounts reimbursed to any Franchisee, to HHF, SCH, and IHG associated with the IHG Rewards Club Hotel Rewards Program;

(d)   An accounting of any and all IHG Marketplace programs;

(e)   An accounting of the Secure Payment Solution credit card processing system;

(f)   An accounting of all internet services and the SCH Merlin communication service;

(g)   An accounting of HHF's Keycard System;

(h)   An accounting of all in-room entertainment, SCH Studio, Employee Safety Devices, reservation and all other equipment, software, and services for property-level technology and telecommunications;

(i)   An accounting of the gift card program;

(j)   An accounting of all mandated food and beverage programs;

(k)   An accounting of all furniture, furnishings, linens, food products, utensils, and goods for guests; and,

    (l)    An accounting of its use of all other fees and penalties imposed upon franchisees.

229.   IHGOA owes a duty to account for monies, specifically its use of the association fee provided by Franchisees who have opted-in.

230.   Upon information and belief, a request for such an accounting from HHF or IHGOA would be futile.

231.   Franchisees are unable to determine the amounts due to them without an accounting and there is no adequate remedy at law without such an accounting, or such legal remedies would be difficult, inadequate, or incomplete.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs Park 80 Hotels LLC and PL Hotels LLC respectfully request that this Honorable Court:

A.    Enter an order against HHF, IHG and SCH in favor of all Plaintiffs for consequential and/or compensatory damages in an amount to be proven at trial, and specific performance of the License Agreements;

B.    Enter an order against HHF in favor of all Plaintiffs for actual damages and treble damages, and reasonable attorney's fees arising out of HHF's violations of the Sherman Act;

C.    Enter a permanent injunction prohibiting HHF's unlawful tying conduct;

D.    Enter a judgment against IHGOA in favor of all Plaintiffs for compensatory and punitive damages;

E.    Declare that the Unconscionable Provisions of the Agreements, specified above, are unconscionable illusory, and/or unenforceable against Plaintiffs;

F.    Enter an order against HHF in favor of all Plaintiffs entitling Plaintiffs to an accounting of all fees paid by them to SCH and HHF, and all rebate payments made to HHF, IHG and SCH by Approved Suppliers and

G.    Award such other relief as this Court deems necessary and appropriate.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues properly so tried.

Dated: May 19, 2021                          Respectfully submitted,

                                             */s/ Joseph C. Peiffer*
                                             Joseph C. Peiffer (La. Bar No. 27349)
                                             Daniel J. Carr (La. Bar No. 31088)
                                             **Peiffer Wolf Carr Kane & Conway, APLC**
                                             1519 Robert C. Blakes Sr. Drive
                                             New Orleans, Louisiana 70130
                                             Telephone: (504) 523-2434
                                             Facsimile: (504) 608-1465
                                             jpeiffer@peifferwolf.com
                                             dcarr@peifferwolf.com

                                             Andrew P. Bleiman (*pro hac vice* forthcoming)
                                             Mark Fishbein (*pro hac vice* forthcoming)
                                             **Marks & Klein, LLP**
                                             1363 Shermer Road, Suite 318
                                             Northbrook, Illinois 60062
                                             T: (312) 206-5162
                                             F: (732) 219-0625
                                             andrew@marksklein.com
                                             mark@ marksklein.com

                                             Justin M. Klein (*pro hac vice* forthcoming)
                                             **Marks & Klein, LLP**
                                             63 Riverside Avenue
                                             Red Bank, New Jersey 07701
                                             T: (732) 747-7100
                                             F: (732) 219-0625
                                             justin@marksklein.com

                                             Justin E. Proper, TA, (*pro hac vice* forthcoming)
                                             **WHITE AND WILLIAMS LLP**
                                             1650 Market Street
                                             One Liberty Place, Suite 1800
                                             Philadelphia, PA 19103-7395
                                             Phone: 215.864.7165
                                             properj@whiteandwilliams.com

                                             *Attorneys for Plaintiffs,*
                                             *Park 80 Hotels LLC and PL Hotels*
                                             *LLC, & the Putative Class*